**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT WINCHESTER**

| | | |
|---|---|---|
| JENNA AMACHER,<br><br>*Plaintiff*,<br><br>v.<br><br>CITY OF TULLAHOMA, TENNESSEE, *et al.*,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:23-cv-40<br><br>Judge Travis R. McDonough<br><br>Magistrate Judge Michael J. Dumitru |

# MEMORANDUM OPINION

Before the Court are the following motions: (1) a motion for leave to file excess pages filed by Defendants the City of Tullahoma, Tennessee (the "City"), Ray Knowis, and Jennifer Moody (Doc. 83); (2) a motion for summary judgment filed by the City, Knowis, and Moody (Doc. 84); and (3) a motion for summary judgment filed by Defedants Scott Van Velsor and Jim Woodward (Doc. 87). The City, Knowis, and Moody's motion for excess pages (Doc. 83) is **GRANTED**, and, for the following reasons, Defendants' motions for summary judgment (Docs. 84, 87) will be **GRANTED IN PART**.

## I. BACKGROUND

The Charter for the City of Tullahoma requires that aldermen reside within the City of Tullahoma. (Doc. 86, at 21.) In 2020, Plaintiff Jenna Amacher was elected as an alderman. At the time Amacher was elected, she owned a residence located at 206 Amherst Drive in Tullahoma. (*See id*. at 14–15.) At all relevant times, Defendant Ray Knowis was the mayor for the City, and Defendant Jennifer Moody was the City Administrator. (*Id*. at 165, 168.)

Amacher acknowledges that she often promotes her conservative ideals online and criticizes other members on the Board of Aldermen for their votes. (*See* Doc. 86, at 102, 107, 170.) In December 2020, someone posted a photo on Facebook of Amacher and her sister-in-law in front of a Confederate flag at what Amacher called a "redneck Christmas party." (*See* Doc. 56, at 3; Doc. 86, at 171.) In that photo, Amacher held a sign that said "finer than frog hair," and her sister held a sign that said "we go together like cocaine and waffles." (Doc. 86, at 171.) After the photo was posted to Facebook, the City started receiving calls from media outlets, and the City put out a statement that Amacher's actions did not represent the values of the City. (*Id.* at 138; Doc. 92-1, at 25.) Moody testified that the photo "bothered" her, and Knowis similarly testified that he was "shocked" by the photo. (Doc. 92-1, at 22; Doc. 92-2, at 6.)

In February 2021, Amacher sold the Amherst Drive property and later purchased a vacant lot on Ledford Mill Road, also in the City. (Doc. 86, at 59, 61, 65–73.) After she sold her property on Amherst Drive, she began living at 762 Blue Creek Road, which is outside the City's limits. (*Id.* at 65–73.) In 2022, while still an alderman for the City, Amacher also began campaigning for a position on the County Commission for Coffee County, Tennessee. (*See id.* at 125.) According to Moody, after Amacher started campaigning, she received a call from the Coffee County election commissioner, informing her that Amacher may not be a "resident" of the City. (*Id.* at 125–26.) Moody also states that Tullahoma citizens inquired into Amacher's residency throughout her time as an alderman. (*Id.* at 165.)

On February 25, 2022, Moody emailed the Municipal Tennessee Advisory Service, an agency that provides legal advice to Tennessee municipalities, seeking guidance as to how to enforce the residency requirement in the City's charter:

I am looking for guidance on the following issues for my Mayor and Board of Aldermen. The specific issue is that we want to know how to enforce the residency requirement in our charter. An Alderman has made a formal complaint to the City Attorney regarding another Alderman's residency. He has investigated it and found that one of our sitting Aldermen sold her primary residence in April 2021 and although she has been evasive for many months regarding where she lives, she has recently declared in a public meeting her official residence. It is a 20-acre agricultural property she purchased in August 2021 with no habitable structure on it. Our City Attorney found that she did inquire about utilities but has not followed through to have any utilities connected, no building permits or site plans for residential construction have been submitted. Further, it is well known and observable that she resides in a property formerly owned by her grandfather (he's deceased) that is located outside the city. Most recently, she filed a petition to run for County Commission using the agricultural property address as her qualifying residence. Her latest action has made clear that she continues to claim as her primary residence a property that has no habitable structure and is not where she is known to actually reside. Board members are looking for assistance to move forward with filling the vacancy that she has created by voluntarily selling her home and failing to show any good faith effort to establish another residence within the City. I've attached a copy of our city charter and the only information I could find that closely approaches this topic – it's a Sid Hemsley opinion from 1994.

In Section 3 of the City of Tullahoma's private act Charter, it states: "No person shall be an Alderman unless he be a citizen of the State of Tennessee and a bona fide resident of the city for which he is elected. Any Alderman, after his election removing from the city, thereby vacates his said office." This infers that the vacancy is automatic and that it occurs as soon as the Alderman is no longer a resident. In Section S. (Terms of office, vacancies.) of the Charter, the Board is empowered to fill vacancies by majority vote of the Board within one month of any vacancy.

Our specific questions are:

1) Is the Board empowered under the City Charter to move forward to fill the vacancy within 30 days?

2) If the Alderman found to be a non-resident will not voluntarily resign the seat or actively disputes/challenges the findings of the City Attorney and Board, what happens next? How does the Board enforce the Charter? Is there a legal action that would prevent the Alderman in question from continuing to attend board meetings and continuing to vote on matters before the board?

Thank you for any assistance that you may provide. I did attempt to call Melissa Ashburn and Elisha Hodge yesterday, but did not reach them and their email addresses are not published on the MTAS website. I believe Steve Worsham may

> have also attempted to contact Melissa this week about this issue as our Board is wanting to address this on Monday at our Board meeting.

(Doc. 92-1, at 87–88.) Moody and Knowis also contacted the City Attorney, Stephen Worsham, who recommended an executive session to discuss Amacher's residency. (Doc. 86, at 165–166; Doc. 92-1, at 32; Doc. 92-2, at 13.)

On February 28, 2022, at the executive session, the Board, Administrator, and City Attorney confronted Amacher about her residency. (Doc. 86, at 166; Doc. 92-2, at 14.) Amacher responded by quoting a Tennessee statute regarding residency and communicated that she intended to remain in the City but did not currently have a place to live. (Doc. 92-1, at 33–34, 37.) Moody recalled there being "a lot of confusion" about the charter's residency requirement and what was required under the law. (*Id.* at 60.) According to Amacher, she believed any issues regarding her residency were resolved by the end of the executive session. (Doc. 86, at 109; Doc. 92-1, 32–34, 37, 60–61.)

Nonetheless, Tullahoma citizens still had concerns about Amacher's residency. On October 3, 2022, Defendant Scott Van Velsor, believing that Amacher was residing outside the City, sent a complaint to District Attorney Craig Northcott, which included signatures from 270 Tullahoma citizens. (Doc. 86, at 23–53, 145–46.) In the complaint to Northcott, Van Velsor requested that Northcott investigate and take action "if reasonable cause is found for such complaint." (*Id.* at 23.) More specifically, Van Velsor's complaint stated:

> Alderman Amacher has knowingly and willfully exercised the legislative and supervisory powers of the office of Alderman for the City of Tullahoma despite knowing that she was not qualified to exercise such powers because she is not a bona fide resident of the City of Tullahoma as specifically mandated in Section 3 of the Tullahoma City Charter. Based on information acquired by the undersigned, Alderman Amacher resides outside the corporate boundary of the City of Tullahoma, Tennessee.

(*Id.*) Based on this complaint, Northcott instructed an investigator to look into the complaints about Amacher's residency, and, on October 10, 2022, he appeared at a City board meeting to summarize the findings of his investigation regarding Amacher's residency.[1] (Doc. 86, at 5, 145, 147.) Based on his investigation, he requested that Amacher resign her position to avoid him filing a quo warranto action, which he contended the law required him to file. (*Id.* at 5.) Amacher responded that she was a lawful resident of the City and refused to resign. (*Id.*) Northcott avers that he attended the board meeting on his own volition based on the complaint he received about her residency and his subsequent investigation. (*Id.* at 147.) Knowis avers that he did not know Northcott was going to be present at the board meeting or that he was going to confront Amacher. (*Id.* at 168.) He also testified that, even though Northcott exceeded his time limit to speak, he allowed him to continue "out of respect for his position as District Attorney," and, when he was finished, he allowed Amacher to respond. (*Id.* at 168–69.)

On October 20, 2022, Northcott filed a petition for quo warranto, alleging that Amacher resided outside the City limits and requesting that the chancery court remove her from her position as alderman. (Doc. 86, at 8.) Before filing the quo warranto action, however, Northcott met with Knowis and Moody. (*Id.* at 166, 168.) Moody and Knowis both aver that at the time of this meeting Northcott was still undecided as to whether he would file the petition, and, when he left the meeting, he was still undecided. (*Id.*) Knowis further testified as follows about the meeting with Northcott:

[1] Around this time, Moody also contacted the Public Entity Partners to determine if their "legal team will assist," noting that she was hoping they "will actually help us understanding our exposures and next steps." Moody further explained that she was seeking this guidance because "I obviously don't know how to advise the Mayor or Board Members – they do not know what their authority or options are and also do not want to appear to validate her residency if they do nothing." (Doc. 92-1, at 89–90.)

Q. Okay. So at what point did you first get in contact with Craig Northcott, the DA, about the residency issue?

A. The only contact that I had with him was when he called and asked to meet about the suit that had been filed. And I felt that it was incumbent upon me as mayor to understand a suit that had been filed or the petition that had been filed. It affected one of our sitting aldermen, so I felt that it was incumbent that I understand the substance of that complaint.

Q. And so you're pretty sure that when you -- the first time you spoke to him he had already filed his lawsuit. Is that what you're saying?

A. He had not filed it at all at that time.

Q. Okay.

A. When I met with him along with Ms. Moody, the city administrator, he had had the complaint. He had not decided whether to prosecute the complaint or not. He was undecided, he was totally undecided, and we – that's the way it was left, was he was considering it.

Q. And who all went to meet with him?

A. Myself and Ms. Moody.

. . .

Q. Did Mr. Northcott ask your opinion about whether she was a valid resident?

A. No, he did not.

Q. Did you tell him one way or the other about whether you thought she was a valid resident?

A. We were not there to tell him anything. We were there simply to understand the nature of the complaint. The answer is no.

Q. And what reasons did Mr. Northcott give for why he might not want to file the lawsuit at that point?

A. I don't believe he verbalized anything.

Q. But it does sound like you're saying he wasn't sure he was going to file it by the time you left?

A. He had not decided at that time, yes.

Q. And you don't think he explained why not?

A. He did not. He was investigate -- he was considering it and investigating the complaint.

(*Id.* at 139–40.) As it relates to his decision to file the quo warranto action, Northcott avers: "I decided to file the Petition in my capacity as District Attorney General based upon probable cause to challenge Ms. Amacher's qualifications as a sitting alderman in connection with the evidence discovered by her residency. I used my own independent judgment and discretion in filing the Petition."[2] (*Id.* at 146.)

On December 6, 2022, Northcott filed an amended quo warranto petition, which stated that Van Velsor was the "relator" and that Defendant Jim Woodward was the "surety" for the quo warranto action.[3] (*Id.* at 54–56.) During the quo warranto proceedings, Amacher admitted that she did not own real property within the City after February 11, 2021, and testified that she was a "guest" at the Blue Creek Road property. (Doc. 86, at 59–61.) When asked if she spent the majority of her nights at the Blue Creek Road property, Amacher responded: "I don't know. I have some – I have spent some nights there, but I don't know if that would be the majority." (*Id.* at 59–61.) Ultimately, the chancery court determined that Amacher resided within the City because she intended to remain in Tullahoma by acquiring the property on Ledford Mill Road, even though she did not currently live on that property. (*See id.* at 65–73.) Specifically, the chancery court explained:

---

[2] Northcott further avers that he "never conspired with Mr. Knowis, Ms. Moody, Mr. Van Velsor, Mr. Woodward, nor anyone on behalf of the City in filing the Petition." (*Id.* at 146.)

[3] Amacher also notes that she opposed a comprehensive zoning proposal called the "2040 Plan," which, according to Amacher, Knowis, Moody, Woodward and Van Velsor all supported. (*See* Doc. 86, at 88, 91; Doc. 92-1, at 55–56; Doc. 92-2, at 20–21.) Nonetheless, in October 2022, the Board voted against the 2040 Plan. (Doc. 86, at 91.)

> In order to determine residency in this instance, the Court is guided by Tenn. Code Ann. 2-2-122 et. seq. and the case law. Relator clearly proved that Amacher occupied the Franklin County Blue Creek address at least from August 2021 to present date. Her assertions that she "lives" at the Ledford Mill property are unconvincing and damaging to her credibility.
>
> However, the analysis under the statute and the case law doesn't end there. Residency determination, as viewed under the guidelines set forth in T.C.A. § 2-2-122 require an analysis of the person's intent and whether or not her physical actions confirm her proffered intent or whether they indicate otherwise. T.C.A. § 2-2-122 (a) (4) covers this scenario where a person may not be physically present, but has always manifested an intent to reside in a certain place.
>
> For a public official who touts transparency, had Amacher been a little more forthcoming about her activities during the summer and fall of 2021 and 2022, a lot of trouble may have been saved. Nevertheless, the evidence showed an unwavering if very plodding effort to establish the Ledford Mill Road property as her residence. The delays are unusual but explainable given the pandemic, supply issues, and the tornado. Two months from the sale of the Macon Manor property to Amacher's offer on the Ledford Mill property is not unreasonable. The 5 months it took for Amacher to obtain financing is not unreasonable. While it is suspicious that Amacher really sped up the construction process after being confronted on October 10, 2022, Amacher did just enough in pursuit of her home construction to manifest her intent to remain there permanently. Viewed another way, the Petitioner showed no evidence that Amacher abandoned her intention. The Court is not convinced that the Blue Creek Road property was anything more than a temporary arrangement for Amacher while the Ledford Mill property was being built. The length of time that it has taken Amacher to finish the home is unimportant when T.C.A. § 2-2-122 (a)(4) principles are analyzed: it excuses absence for "one or more year's duration" as long as the person retains the definite intention of returning. Hence, there was no evidence she ever abandoned that intention.
>
> IN LIGHT OF THE FOREGOING IT IS the finding of the Court that Amacher successfully pled that Ledford Mill Road was her residence. The Relator was unable to prove that Amacher's actions are not covered by Tenn. Code Ann.§ 2-2-122 (a)(4) in that Amacher occupied Blue Creek Road as a temporary location while completing the Ledford Mill Residence. The Petition is DENIED.

(*Id.* at 70–72.)

Amacher initiated this action on October 20, 2023. (Doc. 1.) In her operative complaint, she asserts a claim under 42 U.S.C. § 1983 against all Defendants for retaliating against her, or conspiring to retaliate against her, for exercising her First Amendment right to free speech.

(Doc. 56, at 10.) Amacher also asserts a claim under Tennessee common law against Moody, Knowis, Van Velsor, and Woodward for malicious prosecution or conspiring to maliciously prosecute her. (*Id.* at 11.) Defendants have moved for summary judgment on Amacher's claims against them, and Defendants' motions (Docs. 83, 87) are ripe for the Court's review.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere

scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

### A. Section 1983 Claim for First Amendment Retaliation

In her complaint, Amacher asserts claims under 42 U.S.C. § 1983, alleging that Defendants conspired to violate her constitutional rights to free speech and substantive due process. (Doc. 1, at 9–11.) Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To succeed on a claim under § 1983, a plaintiff must show: "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted). When a plaintiff directs a § 1983 claim against multiple defendants, a third element must be met: because a plaintiff "cannot generically hold one defendant liable for another's actions," "he must allege that each defendant, through that defendant's own actions, subjected him to the constitutional deprivation." *Rudd v. City of Norton Shores*, 977 F.3d 503, 512 (6th Cir. 2020) (citing *Jane Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)) (cleaned up). Nonetheless,

> to act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting [ ] "under color" of law for purposes of § 1983 actions.

*Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). As a result, "claims of conspiracies between private and state actors, if adequately alleged, generally suffice to establish state action on the part of private actors for the purposes of deciding a motion to dismiss." *Rudd*, 977 F.3d at 512. Additionally, although § 1983 typically precludes "holding one defendant vicariously liable for another's actions," conspirators can be "found liable for a tort committed by a coconspirator in furtherance of the conspiracy." *Id*. (explaining that if a plaintiff "plausibly allege[s] a conspiracy against a defendant, the conspiracy allegation offers 'the conceptual spring' for holding that defendant liable for the actions of another defendant").

**i. Conspiracy**

In connection with her First Amendment retaliation claim, Amacher contends that Knowis and Moody conspired with Northcott to retaliate against her.[4] (Doc. 92, at 8–10.) As a result, the Court must first determine whether Amacher has proffered sufficient evidence from which a reasonable jury could conclude that a conspiracy to violate her First Amendment rights existed.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). To prevail on a conspiracy claim under §1983, a plaintiff must demonstrate that: "(1) a 'single plan' existed, (2) defendants 'shared in the conspiratorial objective' to deprive plaintiffs of their constitutional rights, and (3) 'an overt act was committed in furtherance of the conspiracy that

[4] In opposing Defendants' motions for summary judgment, Amacher does not identify any facts suggesting that Knowis and Moody conspired with Van Velsor and Woodward to retaliate against her under § 1983. Rather, in opposing Defendants' motions for summary judgment, she contends that Knowis and Moody conspired with Northcott to violate her First Amendment rights and that Woodward and Van Velsor separately conspired, possibly with Northcott, to maliciously prosecute her. (*See* Doc. 92, at 8–12.)

caused injury' to plaintiffs." *Siefert v. Hamilton Cty.*, 951 F.3d 753, 767 (6th Cir. 2020). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy and each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Bazzi*, 658 F.3d at 602. Nonetheless, to demonstrate a genuine issue of material fact regarding the existence of a conspiracy, a plaintiff is not permitted to rely on "sheer speculation" or a weak "web of inferences." *Id.* at 603. Stated another way, "vague conclusory allegations" of a conspiracy" that are "unsupported by material facts" are insufficient for a reasonable jury to infer that a defendant agreed to a conspiratorial objective. *Id.*

In this case, Amacher has not proffered evidence from which a reasonable jury could conclude that Knowis and Moody conspired with each other or Northcott to retaliate against her for exercising her First Amendment rights. Knowis, Moody, and Northcott have expressly testified or averred that they did not conspire with each other to retaliate against Amacher in connection with Northcott's filing of the quo warranto action.[5] (Doc. 86, at 146, 166, 168.) Knowis and Moody further testified that they did not participate in any of the quo warranto proceedings in chancery court. (*Id.* at 166, 168.) Moreover, Knowis and Moody both testified that when they met with Northcott prior to his filing of the quo warranto action, Northcott was undecided about whether he would file the action and when he left the meeting, he was still undecided. (*Id.*) Consistent with this testimony, Northcott avers that it was his ultimately his

[5] Knowis and Moody have also testified or averred that they did not call upon Woodward or Van Velsor to draft the quo warranto action and that they did not conspire with them to retaliate against Amacher. (Doc. 86, at 132–33, 143–44.)

decision to file the quo warranto action and that he used "his own independent judgment and discretion."[6] (*Id.* at 146.)

Amacher's deposition testimony also confirms that she does not possess evidence beyond vague conclusory allegations and sheer speculation that Knowis, Moody, and Northcott conspired to retaliate against her:

> Q. Again, what evidence do you have of any communication between Jennifer [Moody] and Ray [Knowis] and the DA?
>
> A. The interrogatories say that they communicated.
>
> Q. Okay. That – that's it, though?
>
> A. Yeah.
>
> Q. I mean, there's no –
>
> A. And the fact that they allowed him to come to the meeting and do what he did.
>
> Q. Okay. To go to the next step then, what evidence do you have that Jennifer Moody and Ray Knowis did anything with trying to get people to sign the petition, the 256 or however many it was?
>
> A. I don't know that they did anything to get people to sign the petition, but I do know that they had instructed -- because that was even testified to by one of the individuals, instructed me -- for me to be followed and accounted for by our police chief and our police department, so they used their –
>
> Q. Who –
>
> A. -- position to do that.
>
> Q. Who instructed that?
>
> A. I would assume it would be either -- I mean, technically the police chief answers to Jennifer Moody.

---

[6] There is also no evidence that Moody or Knowis conspired with Northcott in connection with Northcott's decision to appear at the October 10, 2022 Board of Alderman meeting or his decision to confront Amacher about her residency at that meeting. (*See* Doc. 86, at 166, 168.)

Q. I would like to know what evidence you have of Jennifer Moody and Ray Knowis calling upon private citizens to begin drafting a petition for your ouster in the form of emails, text messages, meetings, telephone conversations. Do you have any evidence like that?

A. I don't know.

(Doc. 86, at 108.) Stated another way, Amacher's position is that, because Knowis, Moody, and Northcott had a meeting before Northcott filed the quo warranto action, and because Knowis allowed Northcott to exceed the time permitted in speaking at a Board of Aldermen meeting, there is a genuine issue of material fact as to whether there was a single plan and a shared conspiratorial objective to retaliate against her for exercising her First Amendment rights. Such a position, however, is unsupported by "material facts" and is more properly classified as "conclusory allegations" that rely on a weak "web of inferences" insufficient to demonstrate that genuine issues of material fact exist. *See Bazzi*, 658 F.3d at 602. This conclusion is further supported by Amacher's deposition testimony regarding Knowis and Moody's lack of involvement in the quo warranto action itself:

Q. So did Jennifer and Ray – were they – were they at the trial?

A. No, but they had –

Q. Did they –

A. They had –

Q. So they didn't –

A. – the City attorney there.

Q. So they didn't testify at the trial? They weren't called as witnesses?

A. They wouldn't have any direct knowledge of anything that would be pertinent. This – that I – I mean . . .

Q. Your whole lawsuit is about the direct knowledge you claim that they had about all of this. What are you talking about?

A. The direct knowledge about where I lay my head at night.

Q. I'm not asking you about that. I'm asking –

A. That's what the questions were at the trial.

Q. Okay. Well, you allege here that they must -- somebody asked you about income taxes and your sex life.

A. I allege that their involvement is to retaliate and conspire against me to have me removed from office. That is my involvement – that's their involvement.

(*Id.* at 112). Amacher's allegation that Knowis and Moody's "involvement is to retaliate and conspire against me to have me removed from office" is not evidence of a conspiracy—it is an *allegation* untethered to evidence from which a reasonable jury could conclude that a single plan existed or that Knowis, Moody, and Northcott shared a conspiratorial objective.

Finally, to the extent Amacher argues that Moody's emails to the Tennessee Municipal Services Agency and Public Equity Partners regarding Amacher's residency issue are evidence that a conspiracy existed, these e-mails are also insufficient to create a genuine issue of material fact as to the existence of a conspiracy. Even viewing Moody's e-mails in the light most favorable to Amacher, the e-mails do not suggest that Moody was actively seeking to have Amacher removed from her position as alderman; rather, these e-mails reflect Moody's efforts to understand the legal ramifications of the residency issue so that she can provide guidance to Knowis and the Board of Aldermen. (*See* Doc. 92-1, at 87–90.) At their core, the e-mails simply ask for guidance as to how the City would enforce its Charter's residency requirement if it decided that it needed to enforce that requirement against Amacher. The e-mails do not, however, suggest that it was Moody's goal to have Amacher removed from her position as alderman, and there is nothing in those e-mails that plausibly suggests that the e-mails were sent as part of a single plan or in furtherance of a conspiratorial objective shared by Moody, Knowis, and Northcott.

Amacher has not met her burden of proffering evidence from which a reasonable jury could not conclude a single plan existed or that Knowis, Moody, and Northcott shared a conspiratorial objective to retaliate against her for exercising her First Amendment rights.[7] Accordingly, the Court will **GRANT** Knowis and Moody's motion for summary judgment to the extent Amacher asserts that they conspired against her to violate her First Amendment rights.

---

[7] The Court notes that there is also insufficient evidence from which a reasonable jury could conclude that Van Velsor and Woodward conspired with Knowis, Moody, and Northcott to retaliate against Amacher for exercising her First Amendment rights. Woodward and Van Velsor expressly aver that they "had no agreement or plan with Jennifer Moody, Ray Knowis, or District Attorney Craig Northcott to oust Jenna Amacher from office." (Doc. 86, at 159–160, 165–67.) Amacher also testified that she did not have proof to support her allegation that Woodward and Van Velsor sent the district attorney to confront her in public, "insulting her publicly and calling for her to resign":

> Q. . . . Tell me how Woodward and Van Velsor sent the district attorney anywhere?
>
> A. When they brought him the petition and told him to investigate and probably told him – I mean, I am – I am – I do not know 100 percent, but I would venture to say they told him to go to the board meeting, and they were there with him when they went.
>
> Q. Do you have a scintilla of proof to show that they sent the district attorney anywhere?
>
> A. The fact that they gave him this petition asking him to oust me is what ultimately caused him to come to that board meeting, so . . .
>
> Q. Okay. I'm going to ask you the question again. Do you have a scintilla of evidence to show that they were sending the district attorney anywhere, that they controlled where he was sent?
>
> A. Well, you and I may disagree on what a scintilla of evidence is. But, yes, I agree – I believe that there is a scintilla of evidence by the mere giving him this petition and asking him to do that, that that ultimately is why he came to that board meeting.
>
> Q. Okay. So your only proof on that is that they gave him these petitions and that is what sent him out?
>
> A. (Nods head.)

(Doc. 86, at 117.)

### ii. Merits of First Amendment Retaliation Claim

Because Amacher has not proffered sufficient evidence from which a reasonable jury could conclude that Knowis, Moody, Van Velsor, or Woodward entered a conspiracy to retaliate against her, the Court must now determine whether Amacher has proffered sufficient evidence from which a reasonable jury could conclude that any of the defendants retaliated against her for exercising her First Amendment rights.

The First Amendment prohibits state actors from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I. When a state actor retaliates against an individual for exercising his First Amendment freedoms, that retaliation "is itself a violation of the Constitution." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) ("[T]he injury asserted is the retaliatory accusation's chilling effect on [the plaintiff's] First Amendment rights . . . . We hold that [his] failure to demonstrate a more substantial injury does not nullify his retaliation claim."), *cert. denied,* 524 U.S. 936 (1998); *Rudd*, 977 F.3d at 512 ("As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech.").

To prove a First Amendment retaliation claim under § 1983, a plaintiff must demonstrate that: "(1) [s]he engaged in protected conduct; (2) the defendants took an adverse action against [her]; and (3) a causal connection exists between the two." *Rudd*, 977 F.3d at 513. "[A]n adverse action" is any action "that is '*capable*' of deterring a person of ordinary firmness from exercising the constitutional right in question." *Id*. at 514 (emphasis in original). Although it would "trivialize the First Amendment" if a citizen could "sue over any governmental nuisance,

no matter how inconsequential, . . . nothing justifies harassing people for exercising their constitutional rights." *Id*. As a result, "the deterrent effect on speech 'need not be great' to be actionable." *Id*. (quoting *Thaddeus-X*, 175 F.3d at 397).

Even assuming that Amacher engaged in protected speech, either by posing in front of a Confederate flag or by being an outspoken critic of certain City actions, there is insufficient evidence in the record from which a reasonable jury could conclude that Knowis or Moody took an adverse action against her or that there is a causal connection between her protected speech and Northcott's ultimate decision to file the quo warranto action against her. As discussed above, there is a dearth of evidence in the record suggesting that Knowis or Moody sought to have Amacher removed as an alderman or that they encouraged Northcott to file the quo warranto action. Rather, the undisputed evidence is that: (1) Amacher's photo in front of a Confederate flag "bothered" Moody and "shocked" Knowis; (2) Moody received a call from the Coffee County election commissioner, informing her that Amacher may not be a "resident" of the City and Tullahoma citizens also inquired about Amacher's residency; (3) Moody sought guidance from the Municipal Tennessee Advisory Service and the Public Entity Partners about Amacher's residency issue; (4) the City Attorney recommended an executive session to discuss Amacher's residency; (5) Tullahoma citizens sent a petition to Northcott requesting that he investigate Amacher's residency; (6) Northcott appeared at a Board of Aldermen meeting to summarize the findings of his investigation and request that Amacher resign; and (7) Northcott met with Knowis and Moody prior his filing of the quo warranto action against Amacher. Although Amacher speculates that Knowis and Moody were involved in Northcott's decision to file the quo warranto action, her speculation is not proof, and, without evidence from which a reasonable jury could conclude that Knowis or Moody sought to have Amacher removed from

office based on her protected speech, she cannot meet her burden of providing proof that Knowis or Moody took an adverse action against her or that a causal connection exists between her protected speech and an adverse action they took. As a result, Knowis and Moody are entitled to summary judgment on Amacher's First Amendment retaliation claim against them.[8] [9]

#### iii. *Monell* Liability

The City also argues that, because Knowis and Moody cannot be held liable for First Amendment retaliation, the City cannot be held liable. (Doc. 85, at 28–29.) A municipality cannot be held liable under a respondeat superior theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (stating that

---

[8] Knowis and Moody also argue that Amacher's First Amendment retaliation claim against them fails because they are entitled to qualified immunity. (Doc. 85, at 23–26.) The doctrine of qualified immunity shields individual government officials from damages under § 1983 "as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). In deciding whether a defendant is entitled to qualified immunity at the summary judgment stage, the Court employs a two-part test. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). First, a court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012) (citations omitted). Second, if a constitutional right was violated, a court determines whether the right was clearly established at the time the violation occurred. *Id.* (citations omitted). The plaintiff bears the burden of "satisfy[ing] both inquires in order to defeat the assertion of qualified immunity." *Sumpter*, 868 F.3d at 480 (citing *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015)). Knowis and Moody are also entitled to summary judgment on the basis of qualified immunity because Amacher has not proffered sufficient evidence from which a reasonable jury could conclude that they violated her constitutional rights.

[9] Based on her response brief opposing Defendants' motions for summary judgment, it appears that Amacher has abandoned any claim that Van Velsor and Woodward independently retaliated against her for exercising her First Amendment rights. (*See generally* Doc. 92.) Even if Amacher did persist in such a claim, however, it would fail as a matter of law because there is no evidence in the record that Woodward or Van Velsor were state actors as it relates to actions they took.

municipalities "are not vicariously liable under § 1983 for their employees' actions") (citations omitted). Rather, municipalities may only be liable where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 694; *see also Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right."). "A litigant can show a policy or custom through reference to: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016).

In this case, Amacher effectively concedes that if her First Amendment retaliation claim against Knowis and Moody fails, her claim against the City also fails. Indeed, in her response brief, Amacher states that she "[g]enerally . . . would agree" that if she cannot show a conspiracy or participation in the quo warranto lawsuit by Knowis or Moody, then she cannot establish a First Amendment claim against the City. (Doc. 92, at 20–21.) Amacher then goes on to state that her "only allegation of policy or custom is that Moody and Knowis are final policymakers." (*Id.*) For the reasons discussed above, Amacher's First Amendment retaliation claims against Knowis and Moody fail as a matter of law, and she has failed to proffer any other evidence from which a reasonable jury could conclude that a City custom, policy, or practice was the moving force behind a constitutional violation. Accordingly, the City is entitled to summary judgment on Amacher's First Amendment retaliation claim against it.

### B. Malicious Prosecution

Amacher's amended complaint and response to Defendants' motions for summary judgment make clear that her remaining claim for malicious prosecution is brought under Tennessee state law. (*See* Doc. 56, at 11; Doc. 92, at 11–14.) "Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 Fed. Appx. 382, 384–85 (6th Cir. 2003)). "If [] federal claims are dismissed before trial, [] state claims generally should be dismissed as well." *Id.* (quoting *Wojnicz*, 80 Fed. Appx. 384–85). However, a court should also "consider factors such as judicial economy, convenience, fairness, and comity, when deciding whether to decline to exercise supplemental jurisdiction over the remaining state law claim[s]." *Brown v. Scott*, No. 2:23-CV-162, 2025 WL 1347312, at *4 (E.D. Tenn. May 8, 2025) (quoting Williams v. Cawley, No. CIV.03-10189-BC, 2005 WL 1030338, at *1 (E.D. Mich. Apr. 26, 2005)). There is a "strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed," and it should only be exercised if "the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues." *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011) (citing *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotation marks omitted)).

Here, the Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Amacher alleged claims under § 1983 for First Amendment retaliation. As discussed above, the Court has determined that claim fails as a matter of law and now only Amacher's malicious-prosecution claim under state law remains. The Court finds that the interest of comity outweighs

the interest of judicial economy, and, accordingly, **DECLINES** to exercise supplemental jurisdiction over Amacher's state-law malicious-prosecution claim.

## IV. CONCLUSION

For the reasons stated herein, the City, Knowis, and Moody's motion for excess pages (Doc. 83) is **GRANTED.** Defendants' motions for summary judgment (Docs. 84, 87) are **GRANTED IN PART** as to Amacher's claims under § 1983 for First Amendment retaliation, which are hereby **DISMISSED WITH PREJUDICE**. The Court **DECLINES** to exercise supplemental jurisdiction over Amacher's state-law malicious-prosecution claim, and that claim is **DISMISSED WITHOUT PREJUDICE**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

**/s/ *Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**